17CA1182 Peo v Owens 10-07-2021 COLORADO COURT OF APPEALS Court of Appeals No. 17CA1182 Arapahoe County District Court No. 05CR2945 Honorable Christopher J. Munch, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Sir Mario Owens, Defendant-Appellant. ORDER AFFIRMED Division VI Opinion by JUDGE RICHMAN Welling, J., concurs Berger, J., specially concurs NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced October 7, 2021 Philip J. Weiser, Attorney General, Katharine J. Gillespie, Senior Assistant Attorney General, Jillian J. Price, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Blain Myhre, Alternate Defense Counsel, Englewood, Colorado; Jonathan D. Reppucci, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant 
Table of Contents I. Background . . . . . . . . . . . . . . . . . . . . . . . . 1-3 II. Postconviction Procedures . . . . . . . . . . . . 3-12 A. Law and Standard of Review . . . . . . . . . . 7-8 B. Discussion . . . . . . . . . . . . . . . . . . . . . . . 8-12 1. Rule 35(c) Procedures . . . . . . . . . . . . . 8-10 2. Due Process . . . . . . . . . . . . . . . . . . . . 10-11 3. Review of Post. Court’s Find. of Fact . . 12 III. Alleged Prosecutorial Misconduct . . . . . . 12-39 A. Brady . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15 B. Napue . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16 C. Postconviction Court’s Application of Law 16-17 D. Materiality of Suppressed Evidence . . . . . 18-39 1. Police Bulletin and Versadex Report . . 19-21 2. Impeachment Evidence . . . . . . . . . . . . 21-38 a. Johnson . . . . . . . . . . . . . . . . . . . . . 22-30 b. Sailor . . . . . . . . . . . . . . . . . . . . . . . 30-36 c. Brewer . . . . . . . . . . . . . . . . . . . . . . 36-38 3. Cumulative Effect On the Trial . . . . . . 39 IV. Ineffective Assistance of Trial Counsel . . 39-56 A. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41 B. Discussion . . . . . . . . . . . . . . . . . . . . . . . 42-56 1. Discovery . . . . . . . . . . . . . . . . . . . . . . 42-45 2. Investigation . . . . . . . . . . . . . . . . . . . . 45-54 3. Prejudice . . . . . . . . . . . . . . . . . . . . . . 54-56 V. Juror Misconduct . . . . . . . . . . . . . . . . . . 56-87 A. Postconviction Order . . . . . . . . . . . . . . . 57-62 1. Relationship with Uncles . . . . . . . . . . 57-58 2. Dayton Street Murders Connection . . . 58-59 3. Juror 75’s Questionnaire . . . . . . . . . . 59-60 4. Failure to Disclose Recognition. . . . . . 60-62 B. Applicable Law . . . . . . . . . . . . . . . . . . . . 62-68 C. Standard of Postconviction Review . . . . . 69 D. Discussion . . . . . . . . . . . . . . . . . . . . . . . 69-87 1. Relationship with Uncles . . . . . . . . . . . 69-71 
2. Dayton Street Murders Connection . . . 71-74 3. Juror 75’s Questionnaire . . . . . . . . . . 74-77 4. Failure to Disclose Recognition . . . . . . 78-85 5. Cumulative Effect . . . . . . . . . . . . . . 85-87 VI. Ineffective Assistance of A. Counsel . . . . 87-92 A. Applicable Law . . . . . . . . . . . . . . . . . . . 89-90 B. Discussion . . . . . . . . . . . . . . . . . . . . . . . 90-93 VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . 93 VIII. Special Concurrence . . . . . . . . . . . . . . . . 94-98 
1 ¶ 1 Defendant, Sir Mario Owens, was convicted of the first degree murder of Gregory Vann and the attempted murders of Javad Marshall-Fields and Elvin Bell in Lowry Park. His conviction was affirmed on direct appeal. People v. Owens, (Colo. App. No. 07CA0895, July 26, 2012) (not published pursuant to C.A.R. 35(f)) (Owens I). He now appeals from an order denying his Crim. P. 35(c) motion for postconviction relief. We affirm the postconviction court’s order. I. Background ¶ 2 According to the evidence presented at trial, in the summer of 2004, at the end of a large event in Lowry Park, Owens shot and killed Vann. Owens’s best friend, Robert Ray, subsequently shot Marshall-Fields and Bell but they survived the shootings. The prosecution presented evidence that Owens and Ray fled the scene together, stowed their escape vehicle in a friend’s garage, and spent the night in two motel rooms rented by Ray’s extended family members. A couple of days later, Owens cut his hair, rented a car, and drove to Louisiana. ¶ 3 Before any trial for the Lowry Park shootings, key prosecution witness Marshall-Fields and his fiancee were murdered on Dayton 
2 Street. Owens and Ray were separately tried, convicted, and sentenced to death for the Dayton Street murders.
1 The Lowry Park crimes served to aggravate the Dayton Street sentences. ¶ 4 Owens’s Lowry Park conviction was affirmed on direct appeal in Owens I. He sought review of his Dayton Street conviction via the procedures prescribed for death penalty cases. See Crim. P. 32.2; §§ 16-12-201 to -210, C.R.S. 2020. He later moved for postconviction relief in this case — the Lowry Park case — pursuant to Rule 35(c). The postconviction court denied his Rule 35(c) motion, concluding that Owens had received a fair trial. ¶ 5 On appeal of the Rule 35(c) order, Owens contends that (1) the postconviction court reversibly erred by departing from the postconviction procedures required by Rule 35(c)(3)(V); (2) the prosecution unlawfully suppressed materially favorable evidence; (3) his trial counsel’s deficient investigation constituted ineffective assistance of counsel; (4) misconduct by deliberating Juror 75 deprived him of an impartial jury; and (5) his appellate counsel was 1 Governor Jared Polis has since commuted the death sentences to life in prison. 
3 ineffective. We consider the postconviction court’s extremely thorough order and an unprecedentedly voluminous record in rejecting each contention below. II. Postconviction Procedures ¶ 6 Rule 32.2 proceedings for the Dayton Street case were well underway in 2014, when Owens filed his Rule 35(c) motion for postconviction relief in the Lowry Park case. At that time, Judge Rafferty was assigned to preside over the Rule 32.2 proceedings, and the Lowry Park trial court, Judge Spear, was assigned to the Rule 35(c) proceedings. ¶ 7 After Judge Spear had denied multiple defense motions to disqualify himself in connection with the juror misconduct claim, and after Judge Rafferty had held over eighty days of Dayton Street postconviction review hearings without issuing a decision, the postconviction proceedings for both of Owens’s cases were reassigned to Judge Munch by order of the Colorado Supreme Court. ¶ 8 Shortly after his assignment, Judge Munch informed the parties that he would address the Rule 35(c) petition first, and he authorized an evidentiary hearing on each of the issues now raised 
4 on appeal. Judge Munch ordered that he would “allow testimony from witnesses whose credibility might be important to the determination” of significant issues in the petition. He allocated six days for the Rule 35(c) evidentiary hearing, and, acknowledging substantial witness testimony overlap between the Dayton Street and Lowry Park proceedings,
2 he ordered counsel to designate Rule 32.2 transcripts and exhibits — from Judge Rafferty’s hearings — for his consideration. ¶ 9 The People submitted a witness list of over 100 witnesses, and Owens submitted a witness list of 82 witnesses. After reviewing the parties’ witness lists and offers of proof in conjunction with the Rule 35(c) petition and response, the postconviction court ultimately designated twenty-one witnesses for live testimony — twenty of those witnesses were requested by Owens. The court would allow additional rebuttal witnesses for good cause shown. It further expressed a preference for testimony supplemental to that already 2 The facts of the Lowry Park shootings were presented as CRE 404(b) and res gestae evidence in the Dayton Street murder trial and sentencing. 
5 received in Rule 32.2 hearings, and it allowed the parties to submit offers of proof to supplement the live testimony. ¶ 10 Owens objected to the postconviction court’s outlined procedures. He argued that his presentation of evidence was unduly limited; six days was insufficient time to call twenty witnesses, and he should be permitted to call all of the witnesses on his list. The court stated that it would reconsider receiving live testimony from any undesignated witnesses whose sworn affidavits (or other relevant information) persuaded it that the witness’s credibility was important to the determination of a significant issue. It further explained that it had not authorized live testimony from witnesses (1) whose testimony did not involve a significant credibility question, or (2) who were unlikely to be located and to appear in court to give testimony for the first time after the many intervening years.
3 The court repeatedly told Owens’s counsel that it would consider a departure from these restrictions on a showing of good cause. 3 Judge Munch reasoned that an affidavit from any witnesses who had not previously testified would be adequate. 
6 ¶ 11 Our review of the record does not show that Owens asked the postconviction court to reconsider its need to assess the credibility of any specific witness, submitted any affidavits in support of this need, or asked leave to depart from the court’s guidelines as to any specific witness. Owens presented his evidence in just one full day and two half days, due in part to reaching stipulations with the prosecution as to the testimony to be considered from some of the designated witnesses. Owens called only seven witnesses. The prosecution presented two witnesses in two additional half days. The court accepted written closing arguments, and Owens submitted arguments in excess of 300 pages. ¶ 12 The postconviction court later granted a motion to reopen the proceedings for newly discovered evidence concerning Juror 75’s relationship with Marshall-Fields’s uncles. The court heard additional live testimony from Juror 75 and four new witnesses in a one-day hearing. ¶ 13 One month later, in an extraordinarily lengthy and comprehensive order, the postconviction court denied Owens’s Rule 35(c) petition. On appeal, Owens contends that the court’s evidentiary hearing procedures (1) departed from the procedural 
7 requirements of Rule 35(c) and (2) deprived him of due process. We disagree. A. Law and Standard of Review ¶ 14 A Rule 35(c) motion for postconviction relief “may be denied without an evidentiary hearing only where the motion, files, and record in the case clearly establish that the allegations presented in the defendant’s motion are without merit and do not warrant postconviction relief.” Ardolino v. People, 69 P.3d 73, 77 (Colo. 2003). If an evidentiary hearing is required, Rule 35(c)(3)(V) requires a postconviction court to “take whatever evidence is necessary for the disposition of the motion” at the evidentiary hearing. In reviewing de novo a rule of criminal procedure, we construe the rules to “secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay.” Crim. P. 2; see People v. Steen, 2014 CO 9, ¶¶ 9-10. ¶ 15 A postconviction court has broad discretion to control “the ‘mode and extent of the presentation of evidence.’” People v. Finney, 2012 COA 38, ¶ 64 (quoting People v. Cole, 654 P.2d 830, 832 (Colo. 1982)), aff’d, 2014 CO 38. We review decisions on the presentation of evidence for an abuse of discretion. Id. A court abuses its 
8 discretion only when its decisions are manifestly arbitrary, unreasonable, unfair, or based on a misapplication of the law. People v. Kendrick, 2017 CO 82, ¶ 36. B. Discussion 1. Rule 35(c) Procedures ¶ 16 Owens first argues that the postconviction court abused its discretion and departed from the procedural requirements of Rule 35(c)(3)(V) because it arbitrarily limited the number of witnesses from whom it would consider live testimony and considered transcripts of hearings conducted before Judge Rafferty. We reject these arguments. ¶ 17 Judge Munch’s limitations on the presentation of witnesses were not arbitrary. He agreed to hear live testimony from any witness whose testimony involved a significant credibility question. And he reviewed all designated postconviction testimony related to the Lowry Park case that had been presented before Judge Rafferty. Judge Munch authorized live testimony from eleven witnesses who had previously given postconviction testimony before Judge Rafferty. Despite this authorization, Owens presented only two of those witnesses. As noted on this issue and others, Judge Munch 
9 invited counsel to persuade him to reconsider. Owens did not respond to the invitation. ¶ 18 Owens argues that he was prohibited from presenting any witnesses to support his governmental misconduct/discovery claim. Owens submitted offers of proof for several witnesses related to this claim — Judge Munch took live testimony from two of the witnesses, and nearly all of them had testified before Judge Rafferty. Similarly, Owens argues that his ineffective assistance of counsel claims were hobbled by witness limits. Judge Munch received live testimony from several relevant witnesses, and nearly all of the named witnesses testified before Judge Rafferty. We conclude that Judge Munch considered the evidence “necessary for the disposition of the motion.” Crim. P. 35(c)(3)(V).
4 ¶ 19 Nothing in the plain language of Rule 35, and nothing in any of the cases cited by Owens, prohibits a postconviction court from 4 In contending otherwise, Owens cites numerous cases in which defendants were denied a postconviction hearing. See, e.g., People v. Higgins, 2017 COA 57, ¶ 1. These cases are inapposite to our analysis. The grant of a six-day postconviction hearing is not equivalent to a summary denial of a postconviction motion without a hearing. 
10 considering evidence from postconviction proceedings presided over by a different judge. To the contrary, even at trial, “any judge regularly sitting in or assigned to the court may perform postverdict duties if the judge before whom the defendant was tried is unable to perform those duties because of absence from the district, death, sickness, or other disability.” People v. Rivera-Bottzeck, 119 P.3d 546, 550 (Colo. App. 2004); see Crim. P. 25. And, in any event, Crim. P. 25 limitations on substitution of a judge do not apply to postconviction proceedings. See People v. Brewster, 240 P.3d 291, 301-02 (Colo. App. 2009). ¶ 20 For all of these reasons, we conclude that there was no abuse of discretion and no departure from the procedural requirements of Rule 35 in Owens’s postconviction proceedings. 2. Due Process ¶ 21 Next, Owens argues that Judge Munch’s postconviction procedures violated his due process rights. In disagreeing with this proposition, we note this case was granted virtually every exception to a typical amount of appellate and postconviction review because it served as an aggravator to a death penalty case. Courts considering Owens’s case made many significant accommodations. 
11 Owens was granted significantly oversized appellate briefs on direct appeal; he was permitted to present seven days of postconviction evidence specific to Lowry Park; and Judge Munch considered a monumental amount of evidence from dozens of other postconviction hearings. Moreover, Owens did not argue to Judge Munch that he should hear live testimony from any specific witness. Now, on appeal, Owens argues that live testimony from twelve specific witnesses, including two who were designated for live testimony but Owens did not call, was necessary to the disposition of his motion.
5 This position is untenable. ¶ 22 By any measure, Owens has had a meaningful opportunity to challenge his convictions. That he may not have taken full advantage of the opportunities afforded by Judge Munch does not deprive him of due process. 5 In his opening brief, Owens names Jamar Johnson, Latoya Sailor Ray, John Gonglach, Sharlene Reynolds, Jahmon Gaines, Michael McPherson, Askari Martin, Marcus Baker, Jon Martin, Jamar Dickey, Rashad Mayes, and Stacy Hicks as witnesses precluded from presenting live testimony to Judge Munch. Judge Munch approved two of these witnesses — Jamar Dickey and Jamar Johnson — for live testimony. Owens did not call either of them. Moreover, Owens did not include John Gonglach on the witness list he submitted to Judge Munch. 
12 3. Review of Postconviction Court’s Findings of Fact ¶ 23 We are unpersuaded by Owens’s argument that our normal deference to the postconviction court’s findings of fact and assessments of credibility should be discarded due to the nature of the postconviction proceedings. We note that the only credibility findings in the court’s order concerned Juror 75, a witness from whom it heard multiple days of live testimony. Accordingly, we will apply the established standard applicable to appellate review of factual findings. We defer to all findings of fact and assessments of credibility for which there is record support. See People v. Corson, 2016 CO 33, ¶ 40. III. Alleged Prosecutorial Misconduct ¶ 24 Owens next contends that the prosecution violated his constitutional due process rights by failing to disclose material exculpatory evidence within its control and by eliciting, or failing to correct, false trial testimony and using it to obtain a conviction — conduct recognized as constitutionally repugnant. Brady v. Maryland, 373 U.S. 83 (1963); Napue v. Illinois, 360 U.S. 264 (1959). His claims are based on the prosecution’s failure to disclose: (1) a police bulletin created during the initial investigation 
13 of the Lowry Park shootings and a Versadex report;
6 (2) evidence regarding the criminal histories of and prosecutorial favors done for two of the state’s principal witnesses, Jamar Johnson and Latoya Sailor (Ray’s wife), which might have been used to further impeach their credibility; and (3) a note memorializing statements made by Tetrick Brewer during a police interview. Owens alleges that Brewer was an eyewitness to the Lowry Park shootings. ¶ 25 These contentions present mixed questions of law and fact. People v. Bueno, 2018 CO 4, ¶ 20. We apply a clear error standard to the postconviction court’s findings of fact and review its legal conclusions de novo. Id. A court’s findings are clearly erroneous when they are unsupported by the record. Id. A. Brady ¶ 26 In Brady, the Supreme Court recognized that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to 6 A Versadex report is a document generated by the Aurora Police Department’s records management system. It contains every piece of information compiled by the record-keeping staff or entered by officers. 
14 guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.” 373 U.S. at 87. Later, the Court also recognized that to ensure the “elementary fairness” intrinsic to due process, the prosecution has a duty to disclose material exculpatory evidence even if the defense has not requested it. United States v. Agurs, 427 U.S. 97, 110-11 (1976), abrogated on other grounds by United States v. Bagley, 473 U.S. 667, 682 (1985). ¶ 27 To obtain reversal of a conviction based on a Brady violation, a defendant must demonstrate that (1) the prosecution suppressed specific evidence; (2) the suppressed evidence is exculpatory or favorable to the defendant; and (3) it is material to the case. Bueno, ¶ 29. ¶ 28 Evidence is considered exculpatory or favorable under Brady if it has a tendency to decrease the likelihood of conviction or the severity of the sentence. Id. at ¶ 31. Thus, evidence that suggests a defendant is innocent or impeaches the credibility of adverse witnesses must be disclosed if it is material. Bagley, 473 U.S. at 676-78. Evidence is sufficiently material where “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” 
15 Id. at 682. A reasonable probability is demonstrated when the suppression of evidence undermines confidence in the trial’s outcome. Id. at 678. Given this standard, the materiality of suppressed evidence must be assessed in light of its cumulative effect on the trial, not according to the potential impact of each piece of evidence individually. Kyles v. Whitley, 514 U.S. 419, 436-
37 (1995). B. Napue ¶ 29 Like Brady, Napue addressed the prosecution’s duty to proceed with basic fairness. In Napue, the prosecution’s principal witness testified that he had received no consideration in exchange for his testimony. 360 U.S. at 265. The prosecutor knew this testimony was false but failed to correct it. Id. at 266-67. The Napue Court held that when the prosecution knowingly obtains a conviction through the use of false testimony, even if the testimony goes only to the credibility of the witness, it violates the defendant’s due process rights. Id. at 269. The Court later reexamined this rule in Giglio v. United States, 405 U.S. 150, 153-54 (1972), holding that a defendant’s due process rights are violated not only where 
16 the prosecution knew testimony was false, but also where it should have known testimony was false. ¶ 30 To receive a new trial based on a Napue violation, a defendant must show that (1) “the prosecution’s case included perjured testimony”; (2) “the prosecution knew or should have known of the perjury”; and (3) “the perjury was material.” People v. Medina, 260 P.3d 42, 48 (Colo. App. 2010). False testimony is considered material where there is “any reasonable likelihood that the false testimony could have affected the judgment of the jury.” Id. (quoting United States v. Helmsley, 985 F.2d 1202, 1205-06 (2d Cir. 1993)). Mere inconsistencies in a witness’s story are insufficient to show that testimony was perjured. Gallegos v. People, 116 Colo. 129, 132, 179 P.2d 272, 273-74 (1947) (“The mere fact that sworn testimony may differ from extrajudicial statements does not constitute perjury.”); People v. Valera-Castillo, 2021 COA 91, ¶ 44. C. Postconviction Court’s Application of Law ¶ 31 We first address Owens’s contention that the postconviction court’s entire analysis was flawed because it analyzed the significance of each piece of evidence separately rather than in the 
17 aggregate. We reject this argument on both legal and factual grounds. ¶ 32 We reject the legal argument because Kyles’s admonition that a court should assess the impact of all suppressed evidence collectively does not preclude a preliminary analysis of the impact of each piece of evidence. As the Kyles Court acknowledged, it is impossible to assess the collective impact of suppressed evidence without first understanding the individual force and relevance of each item. 514 U.S. at 436 n.10 (noting that while the cumulative effect of the evidence would be discussed separately, the court evaluated “the tendency and force of the undisclosed evidence item by item; there is no other way”). ¶ 33 We reject the factual argument because the record belies the assertion that the postconviction court failed to analyze the collective effect of all the suppressed evidence. In a section of its order entitled “cumulative effect,” the postconviction court explicitly discussed its view of the evidence as a whole and drew conclusions based on all the evidence. Accordingly, Owens’s contention is without merit. 
18 D. Materiality of Suppressed Evidence ¶ 34 The parties largely agree that the items of evidence at issue were not disclosed by the prosecution and that this evidence was, to varying degrees, favorable to Owens or exculpatory. To the extent they disagree, we need not resolve these disagreements because even if we assume that each piece of evidence at issue was suppressed and was also favorable or exculpatory, Owens’s Brady claims fail. He has not shown there is a “reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Thus, the allegedly suppressed evidence is insufficiently material to warrant a new trial. ¶ 35 Further, to the extent Owens asserts that his due process rights were violated under Napue or Giglio, he has not shown that the objectionable testimony was false, much less perjured, nor has he demonstrated its materiality. Medina, 260 P.3d at 48; Gallegos, 116 Colo. at 132, 179 P.2d at 273-74. ¶ 36 We address the materiality and, if relevant, alleged falsity of each type of evidence separately and then turn to its collective impact. Kyles, 514 U.S. at 436-37. 
19 1. Police Bulletin and Versadex Report ¶ 37 Owens asserts, and the prosecution concedes, that the prosecution did not disclose (1) a police bulletin, created the night of the shootings and distributed to patrol officers, that listed preliminary descriptions of one or more Lowry Park suspects and a description of the escape vehicle; and (2) a Versadex report that purported to show, among other things, a list of initial suspect descriptions and/or identities. The Versadex report named Owens, Ray, Sailor, and one other person as possible suspects and also separately identified five suspects exclusively by their physical descriptions. ¶ 38 According to Owens, these documents are exculpatory because many of the preliminary suspect descriptions are inconsistent with descriptions of Owens on the night of the shootings. He argues that had the evidence been available, these suspect descriptions would have substantially undercut the prosecution’s argument that descriptions of Vann’s shooter were relatively consistent, and Owens’s attorneys, in turn, might have chosen to rely on misidentification or alternate suspect defenses rather than self-
defense. 
20 ¶ 39 Although this argument has some superficial appeal, it fails in light of the cumulative testimony and evidence before the postconviction court. At one postconviction hearing, the author of the bulletin, Officer Thomas Wilson, testified that it did not accurately reflect the number of suspects, nor did it contain an accurate description of any particular suspect. Rather, the bulletin’s suspect descriptions were an amalgam of the average heights and weights of several possible suspects based on multitudinous witness descriptions. The only description that Wilson knew to be accurate was the description of the escape vehicle, which was undisputed at trial. Similarly, Wilson explained that the Versadex report reflected a jumbled mix of raw data gathered by multiple officers and put in the system without context by the records staff. Thus, it did not necessarily provide accurate descriptions of the number of suspects or the appearance of any particular suspect. ¶ 40 Given the paucity of meaningful data contained in these documents, they would not have materially added to the mix of identity information available to defense counsel, who possessed myriad police reports containing a great variety of suspect 
21 descriptions. Further, as discussed more fully below, infra Part III.D.2.a, when compared with other forceful and ample evidence that Owens was the person who shot Vann, the bulletin and report were unlikely to convince defense counsel to abandon their self-
defense strategy. ¶ 41 While we have carefully considered Owens’s argument that the postconviction court erred by placing great reliance on Wilson’s testimony about the purpose for which the evidence was created, rather than considering its value to the defense, we do not agree that the bulletin and Versadex report are material when viewed from the perspective of the defense. The evidentiary significance of these documents cannot be accurately assessed by either party apart from the context in which they were created. Given this context, and in light of other available evidence, we conclude that the bulletin and report are not material under Brady. 2. Impeachment Evidence ¶ 42 Owens further contends that the prosecution’s failure to disclose several pieces of evidence relevant to the credibility of witnesses Johnson and Sailor prevented the defense from effectively impeaching these witnesses. According to Owens, these failures 
22 likely changed the outcome of the case because Johnson’s and Sailor’s testimony was necessary to prove two facts essential to the prosecution’s theory of the case: (1) that Owens was the person who shot Vann; and (2) that the shooting was the result of an argument that had spontaneously erupted at Lowry Park between Ray and Owens on one side and the victims and their friends on the other. Owens asserts that had the defense been aware of all of the impeachment evidence known to the prosecution, they might have chosen to contest Owens’s identity as Vann’s shooter and argue that the shooting was caused by a gang-related altercation that did not involve Owens. ¶ 43 To address these contentions, a brief summary of the relevant statements and history of each witness is necessary. a. Johnson ¶ 44 Johnson testified that he knew Ray and Owens and he was at Lowry Park at the time of the shootings. He also testified that he saw Vann punch Owens and Owens shoot Vann. In addition, he said that he saw Ray shoot Marshall-Fields and Bell. ¶ 45 At trial, the prosecution asked Johnson about his reasons for testifying. He stated that he did not want to testify. He also noted 
23 that the first time he spoke to police about this case, he was in jail because he had violated the terms of his probation on a felony menacing conviction in Boulder County. He stated that he had lied to police at that time, telling them he had no idea how the shootings happened. ¶ 46 The prosecution then asked why he had eventually agreed to cooperate. He said that his Boulder County probation violation resulted from new robbery and theft charges in Arapahoe County, that the district attorney “bumped up” the Arapahoe County charges so that his bond would be revoked, and that he had worked out a deal with the prosecutor’s office for a deferred judgment on the new charges. Johnson explained that his deal required him to testify truthfully and that he would not have testified unless prosecutors had made a deal with him. ¶ 47 On cross-examination, Johnson admitted that when he agreed to testify, he was facing substantial prison sentences in his Boulder and Arapahoe County cases, he was in “a bind,” and he had “a big hammer over his head.” He agreed, with respect to his Arapahoe County deal, that he had “never gott[en] a deal that good before,” presumably in prior cases in which he was charged as a criminal 
24 defendant. He further agreed that the Boulder County prosecutors did not ask the sentencing court to impose a custodial sentence, although he had violated his probation, and that they simply reinstated his probation without any further penalty.
7 Johnson conceded that if he had not cooperated with the prosecution, he would likely have faced prison time. ¶ 48 In his postconviction motion, Owens alleged that the prosecution suppressed several pieces of material evidence that would have shown: • In a prior case, Johnson had cooperated with prosecutors to get a deal for himself while implicating his codefendants. • In his initial police interview, a detective told Johnson that if he did not cooperate, he could face charges in the Dayton Street murders under a complicity theory. 7 In closing arguments, the defense highlighted the lenient treatment Johnson received from the Boulder County prosecutors, reminding the jury that “[t]he probation violation in Boulder just disappears. It’s dismissed. . . . Oh, worked out well for him and all he’s got to do is come in here and say what the prosecutors want him to say.” 
25 • Before grand jury proceedings began, prosecutors kept applying pressure regarding potential charges in the Dayton Street murders by emailing Johnson’s counsel and urging him to cooperate and by issuing a grand jury subpoena advising Johnson of his rights. • Before Johnson decided to cooperate, the lead prosecutor in Owens’s case pressured Boulder prosecutors to revoke Johnson’s probation to secure his cooperation. • After Johnson decided to cooperate, the prosecutors in Owens’s case advised the Boulder prosecutors that they needed to “do more for [Johnson]” because he was “the single most important witness,” and they subsequently reinstated his probation with better terms. • After Johnson agreed to cooperate, he was ticketed for driving under suspension in Arapahoe County; the lead prosecutor said he’d “take care of it,” and he got Johnson’s court date postponed because Johnson was in the witness protection program. • The driving charge could have triggered revocation of his probation or deferred judgment, but neither the Boulder 
26 nor the Arapahoe prosecutors imposed any consequences. • Johnson witnessed or was temporarily a suspect in several gang-related shootings after the Lowry Park shootings; relatedly, during one police interview, he admitted he was associated with the Bloods gang although he had previously denied being a member. ¶ 49 While we agree that much of this evidence should have been disclosed and that some of it could have been used to further impeach Johnson, for two reasons, it is not material under Brady’s standard. ¶ 50 First, the evidence is merely cumulative of other significant trial evidence that Johnson was in severe legal jeopardy when he agreed to testify and prosecutors gave him an extremely favorable deal. In fact, Johnson admitted that he was testifying to gain prosecutorial leniency and would not have done so otherwise, the very point the additional evidence would have supported. Where evidence provides only marginal additional impeachment value because the credibility of the witness has already been impeached in the same respect by other evidence, there is generally no 
27 reasonable probability that disclosure of the additional evidence would have changed the outcome. United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011) (stating that additional impeachment of an already-compromised witness is not material unless the evidence provides an entirely new basis for impeachment); Douglas v. Workman, 560 F.3d 1156, 1174 (10th Cir. 2000) (noting that cumulative “evidence insignificantly impacting the degree of impeachment may not be sufficient to meet the Kyles materiality standard, while evidence significantly enhancing the quality of the impeachment evidence usually will”). ¶ 51 Second, Johnson’s testimony that Owens was one of the shooters at Lowry Park was corroborated by several sources. Sailor testified that Ray made statements implying that Owens shot Vann, and more significantly, Owens admitted in her presence that he “emptied his clip” at the park, see infra Part III.D.2.b. Sailor also identified Owens and Ray in a video, taken on the night of the shooting, showing two men lifting up their shirts, apparently to flash the guns in their waistbands. Cashmeir Jones, Owens’s girlfriend, testified that she saw “[Ray] or [Owens] or both” lifting their shirts that night, but she did not recognize Owens on the 
28 video. Bell, Marshall-Fields, and eyewitness Jeremy Green all described a shooter that matched Owens’s description: 6’ 1”, 165 or 180 pounds, wearing a white t-shirt, braids, blue jean shorts, and a white hat.
8 Both Jones and Sailor testified that after the shooting, Owens cut off his distinctive braids. He then left the state, driving to Louisiana and staying there until he was arrested. The materiality of cumulative impeachment evidence is reduced where an adverse witness’s testimony is strongly corroborated. Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013); United States v. Jones, 160 F.3d 473, 479 (8th Cir. 1998); Graham v. Wilson, 828 F.2d 656, 660-61 (10th Cir. 1987). ¶ 52 Finally, we reject Owens’s contention that Johnson’s alleged gang activity was material. The evidence cited by Owens demonstrates that Johnson was a witness, not a participant, in several possible gang shootings. And Owens presents scant evidence that prosecutors ever acted on Johnson’s behalf in this respect. He cites only one specific incident of potential favorable 8 Green described the shooter as “dark-skinned” and wearing a dark-colored hat, features that did not match other descriptions of Owens. 
29 treatment: after one shooting in which Johnson was not a suspect, he might have given police a fake name (this evidence was controverted) and he did not face charges for that alleged conduct. Evidence that the government was not as hard on a witness as it might have been with respect to each and every potential charge does not amount to proof that a witness had a tacit agreement to testify in exchange for additional governmental leniency. Wisehart v. Davis, 408 F.3d 321, 325-26 (7th Cir. 2005) (Criminal trials “must not be allowed to turn into [inquiries] into disparate treatment of criminals, with . . . witness[es] being asked whether [they]’d received any benefit that [they] would not have received had the state not wanted [their] testimony and whether therefore [they] feared retaliation if [they] stopped playing ball.”). Absent such an agreement, this evidence lacks both probative force and materiality. ¶ 53 Moreover, to the extent that Owens asserts Johnson perjured himself when he denied being a “member” of a gang during his grand jury testimony and later admitted to being an “associate” of the Bloods gang during a police interview, we conclude that Owens has not shown that Johnson testified falsely. Johnson used different terms for his involvement with gangs, or lack thereof, in 
30 these statements — denying he was a “member” but admitting he was an “associate.” This testimony was buttressed by a detective’s grand jury testimony, disclosed to the defense, where she stated that Johnson was “affiliated” with gangs but may not have been a “blessed in member.” Because these statements are nuanced, they are not patently false. As such, they do not trigger prosecutorial obligations under Napue or Giglio. Gallegos, 116 Colo. at 132, 179 P.2d at 273-74. b. Sailor ¶ 54 Sailor testified at trial that Ray showed up at Lowry Park angry and drunk. She feared Ray might get into a fight, so she called Owens and asked him to come get Ray. Owens arrived at the park a short time later. Sailor testified that as she was leaving the park, she heard gunshots but did not see who was shooting. Later, she met up with Ray and Owens at Ray’s apartment. She stated that Ray was angry with Owens and asked him “why he did the shooting, why he didn’t just shoot in the air.” Sometime later, Owens admitted that he “emptied his clip.” She also testified that Ray and Owens hid at a motel and at family members’ houses for several days after the shootings. 
31 ¶ 55 At trial, she admitted that, before she agreed to cooperate, she was charged as an accessory to murder in this case and was also facing separate drug and weapons possession charges. She stated that her attorney had worked out a plea bargain with prosecutors in exchange for her cooperation, that prosecutors dismissed her drug and weapons charges as a result, and that she was given a deferred judgment on the accessory charge. She further conceded that her deal required her to testify and that she had testified five times. When asked whether she would have come forward had she not faced criminal charges, she noted that she would have done so but that she did not “agree to come forward” until police caught “the main suspect.” ¶ 56 In his postconviction motion, Owens asserts that prosecutors suppressed several material items: • evidence that, contrary to Sailor’s testimony, she did come forward before Owens was in custody, and that Sailor’s lawyer started negotiating a plea deal with prosecutors before Owens was arrested; • evidence that Sailor received prosecutorial assurance that social services would not take her son; and 
32 • evidence that, while Sailor was in witness protection, a detective in Owens’s case set up an interview with Sailor in Colorado at the request of detectives in Michigan so that she could confirm or controvert the alibi given by an ex-boyfriend in an unrelated Michigan homicide case. ¶ 57 After reviewing the allegedly suppressed evidence, we conclude that it was not material under Brady nor did its nondisclosure violate the due process rights recognized in Napue or Giglio. ¶ 58 As an initial matter, although Owens alleges that Sailor falsely testified that she did not “come forward” until Owens was in custody, the record does not support the assertion that this testimony was false or perjurious. United States v. McNair, 605 F.3d 1152, 1208 (11th Cir. 2010) (noting that perjury requires a willful intent to provide false testimony, not a misstatement resulting from mistake, confusion, or faulty memory). The postconviction evidence did show that Sailor authorized her attorney to initiate plea negotiations well before police arrested Owens and that her attorney provided prosecutors with a skeletal outline of her knowledge before Owens was in custody. 
33 Nonetheless, it also showed that Sailor did not speak to the police herself or make a formal proffer until after Owens was arrested. ¶ 59 The trial transcripts indicate that Sailor did not view the pre-
proffer negotiations as “coming forward.” Thus, she did not give false or perjured testimony. In fact, in a follow-up question, the lead prosecutor clarified what Sailor’s statement meant: Prosecutor: Did you become aware under [sic] November or December 2005, that Mr. Owens was arrested? Sailor: Yes Prosecutor: Is that what you’re referring to that you came forward then? Sailor: Yup Prosecutor: All right. . . . [B]y [the date of the proffer] at least, [you had] worked out an agreement with my officers? Sailor: Correct ¶ 60 It is apparent that Sailor was referring to her final agreement with prosecutors when she said she did not “come forward” prior to Owens’s arrest. Prosecutors had no obligation, pursuant to Napue or Giglio, to correct this testimony because it was not false or perjurious. 
34 ¶ 61 Further, we agree with the postconviction court’s conclusion that even if Sailor’s testimony that she did not “come forward” before Owens was arrested were inaccurate, the testimony is insufficiently material to support reversal of Owens’s conviction. As the postconviction court noted, during the Lowry Park trial, Sailor did not testify that she failed to come forward because she was afraid of Owens, thereby implying that he was capable of harming a witness. Rather, without explicitly offering a motive, she described the timing of her cooperation as it related to Owens’s arrest. Because she did not clarify why she hesitated to make a deal with prosecutors, the challenged testimony did not necessarily incriminate Owens or explain Sailor’s motives. Accordingly, controverting this testimony would not have “affected the judgment of the jury.” Medina, 260 P.3d at 48. ¶ 62 Moreover, with respect to the assertion that prosecutors assured Sailor they would prevent social services from becoming involved, the postconviction court found there was no evidence of such a promise. This finding is supported by the record. The record shows that, while she was in jail, Sailor’s priority was to be reunited with her son. Her attorney told prosecutors that she 
35 feared social services might become involved. Defense counsel’s notes reflect only that prosecutors responded, “they are looking at [Sailor] being allowed to leave to another state with her child, and a sentence with no incarceration.” This statement does not amount to a secret promise to prohibit social services’ involvement. Further, the defense knew Sailor had been moved out of state with the witness protection program, the very thing prosecutors promised her. Because the allegedly suppressed evidence does not demonstrate the existence of an undisclosed promise, it is not material. ¶ 63 Finally, evidence showing that a Colorado detective helped Michigan detectives set up an interview with Sailor is also immaterial under Brady. Owens asserts that this evidence would have been “another link in a chain of threats, intimidation, and promises that secured Sailor’s cooperation.” However, the record shows that neither the detective in this case nor the Michigan detectives ever believed Sailor was a suspect in the Michigan case. The record is also devoid of evidence that prosecutors personally, or through the Michigan detectives, threated Sailor or offered her benefits, implicit or otherwise, in exchange for the interview. There 
36 is some evidence that Sailor, nonetheless, felt vaguely threatened by the additional contact with another law enforcement agency. This evidence might have some impeachment value, but it would only be incremental in light of the much more forceful evidence that she was motivated to testify by her plea deal. Douglas, 560 F.3d at 1174. ¶ 64 In any event, had defense counsel chosen to elicit evidence that prosecutors attempted to intimidate Sailor by setting up a police interview while she was in witness protection, this testimony was likely to have opened the door to damaging evidence that Owens previously sought to exclude — the fact that Sailor could not be located because she was in the witness protection program due to the Dayton Street murders and her status as a witness in this case. Given this risk, it is unlikely that defense counsel would have elicited evidence on this topic or that if the defense had done so, it would have changed the outcome. c. Brewer ¶ 65 According to notes taken by a detective in the Lowry Park and Dayton Street cases, Tetrick Brewer served as a one-time confidential informant. The detective interviewed Brewer after each 
37 incident. Her notes reflect that, with respect to the Lowry Park shootings, Brewer first stated he had talked to Candace Parker. The notes then explain, “Had just got there right before it happened. There was a fight. The dude got into the fight and lost and went to the car [sic] get a gun [sic] came back and shot . . . . Just heard that there was one shooter.”
9 When asked about these notes, the detective testified that what Brewer told her was “all secondhand stuff that he had heard from Candace Parker.” The defense disputes the assertion that Brewer was not an eyewitness. ¶ 66 On appeal, Owens contends, and the prosecution concedes, that the detective’s notes were not disclosed to the defense. According to Owens, Brewer’s statements suggest that “Ray, not 9 The notes also reflect that Brewer indicated Johnson was “hanging with the Montbello bloods” at the time of the Dayton Street murders and was “pretty much the leader.” On appeal, Owens argues these statements provided additional evidence the shootings were “possibly gang related” and Johnson was involved. However, he made no such argument in his Crim. P. 35(c) motion. In fact, postconviction counsel argued the opposite, asserting that trial counsel rendered ineffective assistance because they failed to object to the admission of any and all gang-related evidence. With respect to that issue, counsel asserted, “There is no evidence that the Lowry Park shooting was gang related in any fashion.” Because Owens did not preserve this argument, we do not address it. People v. Huggins, 2019 COA 116, ¶ 17. 
38 Owens, was Vann’s shooter” and, when viewed in conjunction with similar eyewitness statements, Brewer’s statement might have convinced defense counsel to abandon a self-defense theory and, in turn, convinced a jury that Johnson’s and Sailor’s testimony was false. We disagree. ¶ 67 As the postconviction court concluded, the trial evidence showed that Vann and Bell were shot with guns of different calibers, making it unlikely that defense counsel would have argued, or the jury would have believed, that Ray was the only shooter. For that reason, like the postconviction court, we are not persuaded that Brewer’s statements would have altered defense counsel’s strategy. ¶ 68 In addition, as Owens noted, several eyewitnesses whose statements were apparently disclosed to the defense described a single shooter that matched Ray’s description. Even assuming that Brewer was an eyewitness, we are not persuaded that his cumulative statement would have tipped the scales in favor of pursuing a mistaken identity defense. Therefore, we do not perceive his statements to be material under Brady. 
39 3. Cumulative Effect on the Trial ¶ 69 After a careful review of the cumulative effect of all the allegedly suppressed evidence, we conclude that Owens failed to demonstrate the trial was materially altered by prosecutorial failures to disclose identity evidence. The defense was in possession of multiple items of evidence that permitted the jury to infer that Owens was not Vann’s shooter. Brewer’s statements and the Versadex report and police bulletin did not add significant new information. We further conclude that all the impeachment evidence raised by Owens is cumulative of other significant impeachment evidence. This evidence was used to comprehensively and competently impeach Sailor and Johnson at trial. There is no reasonable probability that the outcome would have been different if the allegedly suppressed evidence had been disclosed. IV. Ineffective Assistance of Trial Counsel ¶ 70 Owens next contends that trial counsel rendered ineffective assistance by failing to devote adequate time and to conduct a reasonable investigation of Owens’s case. According to Owens, counsel’s failures include a lack of diligence in reviewing discovery, interviewing eyewitnesses, and investigating adverse witnesses. 
40 Owens asserts that these investigatory failures made it impossible for defense counsel to make a professionally reasonable decision regarding whether to pursue a self-defense strategy or to contest Owens’s identity as Vann’s shooter. He argues that had counsel done a more thorough investigation, it is likely they would have presented a different defense, successfully arguing that an alternate suspect killed Vann. Thus, Owens contends that trial counsel’s failures deprived him of a fair trial. A. Law ¶ 71 The right to counsel, as guaranteed by the United States and Colorado Constitutions, necessarily includes the right to effective assistance of counsel. U.S. Const. amend. VI; Colo. Const. art. II, § 16; Strickland v. Washington, 466 U.S. 668, 686 (1984). In a postconviction proceeding, a conviction is presumed valid and the defendant bears the burden of proving that he is entitled to postconviction relief. Dunlap v. People, 173 P.3d 1054, 1061 (Colo. 2007). To prove that counsel provided ineffective assistance, a defendant must show that (1) counsel’s acts or omissions “fell below an objective standard of reasonableness”; and (2) he was prejudiced by counsel’s errors, meaning that there is a reasonable probability 
41 that “but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 688, 694; People v. Washington, 2014 COA 41, ¶ 23. Both prongs of the Strickland test present mixed questions of law and fact. Dunlap, 173 P.3d at 1063. We review findings of fact for clear error but legal questions are subject to do novo review. Id. ¶ 72 Because our analysis may be distorted by hindsight, we must be highly deferential to counsel, giving them the benefit of a strong presumption that their conduct was within the “wide range of professionally competent assistance.” Strickland, 466 U.S. at 690; see People v. Gandiaga, 70 P.3d 523, 525 (Colo. App. 2002) (the constitutional right to effective assistance of counsel is not a guarantee against strategic mistakes or a critique of counsel’s judgment using the benefit of hindsight). We must judge the reasonableness of counsel’s conduct on the facts of the case, viewed as of the time of the conduct. Strickland, 466 U.S. at 691. The benchmark for evaluating any claim of ineffectiveness is whether counsel’s conduct so undermined the adversarial process that the result of the trial is unreliable. Id. at 686. 
42 B. Discussion ¶ 73 First, we note that Owens’s representation was complicated by the fact that he had two different teams of lawyers before trial. He received appointed counsel through the public defender’s office shortly after his arrest in November 2005. His first team consisted of Douglas Wilson as lead lawyer, Daniel King as second chair, and Jason Middleton as third chair. In late September 2006, Wilson was appointed to head the state public defender system and he accordingly transferred his caseload to others. King became lead counsel, Laurie Rose Kepros was chosen as second chair, and Middleton remained in third position. This second team tried Owens’s case. Owens’s ineffective assistance claim arises, in part, from an assertion that the transition impeded counsel’s investigation. We discuss the effect of the transition on the investigation in more detail below. 1. Discovery ¶ 74 Defense counsel received the first batch of discovery in late December 2005. Owens asserts that, for the following three months, his defense team completely ignored the 1,255 pages of discovery provided. By April 2006, according to Owens, over 8,000 
43 pages of unreviewed discovery had built up. In May 2006, counsel successfully moved to continue the preliminary hearing, noting that they needed more time to review discovery. In June, counsel filed another motion to continue the preliminary hearing, but the motion was denied. In October, Kepros joined the team. She was “concerned” because she had “something like 12,000 pages of discovery to review.” Approximately three months later, the defense team moved unsuccessfully to continue the impending January 2007 trial because, among other issues, they weren’t fully familiar with all the discovery materials. ¶ 75 Despite these allegations, the postconviction court found that “trial counsel’s review of the evidence before selecting their theory of defense was adequate.” ¶ 76 Insofar as this finding applies to the trial team’s efforts to review discovery, we conclude that there is evidence to support the finding. In their postconviction testimony and their motion to continue the trial, both King and Kepros were indeed clear that they desired more time to review discovery. Even so, the record belies Owens’s assertions that counsel simply ignored discovery or were unable to review it in any meaningful way before they made a 
44 decision to pursue a self-defense strategy sometime after October 2006.
10 ¶ 77 At a hearing in mid-January 2006, King indicated to the trial court that he had read all 1,300 pages of initial discovery. The next month, in a motion seeking additional discovery, counsel indicated that the defense had reviewed 1,825 pages of discovery as well as various media items. Contrary to Owens’s assertion that by month four, 8,000 pages of previously disclosed materials remained unreviewed, the record shows that, in April 2006, the defense had just received 8,000 pages of new discovery pertaining to both the Dayton Street murders and the Lowry Park shootings. According to King, the defense had to read “every word” to determine which case each piece of discovery pertained to. Despite this burden, King had 10 King testified that when Wilson left the case in October 2006, no final decision regarding defense strategy had been made. A final decision was reached only after Kepros joined the team and trial was approaching. Kepros testified that, at least initially, she and King had some disagreement regarding which defense to pursue. She was troubled that some witnesses described a shooter who did not resemble Owens. However, since King was lead counsel, he ultimately made the final decision to pursue self-defense sometime between October 2006 and the January 2007 trial. Middleton testified that the selection of a defense was not his role, although he may have participated in discussions. 
45 scanned and at least “cursedly [sic] read” all discovery before trial. Further, although Kepros had a steep hill to climb in familiarizing herself with all the discovery, she attended most of Ray’s Lowry Park trial in October 2006 to “get up to speed on the big picture issues in the case” and continued to review discovery as she worked on the investigation. Given this evidence, the postconviction court’s finding that trial counsel’s review of the unusually voluminous discovery materials was adequate was not clearly erroneous. 2. Investigation ¶ 78 Owens’s challenge to defense counsel’s investigation also arises from their failure to interview multiple eyewitnesses whose descriptions of the shooter purportedly aligned more closely with Ray’s appearance than with Owens’s, or who named Ray as a shooter based on familiarity with him. Owens also raises counsel’s alleged failure to investigate Johnson and another eyewitness, Jon Martin, as likely alternate suspects. According to Owens, because the defense team didn’t interview all the eyewitnesses, it didn’t have enough information to make a reasonable decision regarding defense strategy. In other words, in the absence of a reasonable investigation, no reasonable strategic decision was possible. 
46 ¶ 79 With respect to counsel’s duty to investigate, Strickland directs that “strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.” 466 U.S. at 690-91. Here, Kepros and King both stated that they believed their investigation was incomplete at the time of trial. The motion to continue also reflected this belief.
11 Thus, the question before us is whether the purportedly “less than complete investigation” was nonetheless the result of trial counsel’s reasonable professional judgment regarding which avenues of investigation to pursue given 11 We note that, when trial is upon them, most good defense attorneys would prefer to have more time to investigate the case. King’s and Kepros’s testimony supports the notion that the trial judge should have granted a continuance, but the fact that the defense wanted more time to investigate does not necessarily mean their investigation fell below a standard of professional reasonableness. Harrington v. Richter, 562 U.S. 86, 105, 109 (2011) (noting that the Strickland standard measures whether counsel was incompetent under objective professional norms, not whether they followed best practices or common custom according to their own subjective assessments). In any case, in Owens I, another division of this court previously denied Owens’s challenge to the trial court’s denial of a continuance and that issue has been fully resolved. 
47 the time and resources available. Id. at 691 (“[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.”). ¶ 80 The postconviction court answered this question in the affirmative because, while counsel may have preferred to interview additional witnesses before trial, their investigation was not so incomplete that it failed to meet a standard of professional reasonableness. For several reasons, we agree with the postconviction court’s conclusion. ¶ 81 First, our charge is to evaluate the reasonableness of counsel’s conduct in light of the surrounding circumstances. Id. Here, in evaluating counsel’s conduct, we are cognizant that Owens’s case was unusually burdensome for the lawyers. At the time of these investigations, Owens’s counsel was simultaneously representing Owens in the Dayton Street murders and the Lowry Park shootings. Thus, although counsel did not “choose” to stop pursuing certain eyewitnesses even up to the time of trial, counsel did choose to pursue certain witnesses first, knowing that, at some point, a strategy decision would have to be made. Harrington v. Richter, 562 
48 U.S. 86, 108 (2011) (stating that counsel is entitled to balance limited resources according to their expertise on effective trial tactics and strategies). Given the fact that the shootings took place in a crowded park, and the number of eyewitnesses was therefore unusually large, there was a risk that some eyewitnesses might not be interviewed or subpoenaed before trial. Counsel need not interview every potential witness in a case to provide effective assistance. People v. Benney, 757 P.2d 1078, 1080 (Colo. App. 1987) (holding that trial counsel did not render ineffective assistance where he only interviewed some of the prosecution’s witnesses and largely focused on the chief witness); see also Riley v. Payne, 352 F.3d 1313, 1318 (9th Cir. 2003) (noting that counsel does not perform deficiently simply because some witnesses were not interviewed). They need only conduct an investigation sufficient to reveal potential defenses as well as weaknesses in the prosecution’s case. People v. Dillard, 680 P.2d 243, 245 (Colo. App. 1984). ¶ 82 Second, Owens was a suspect in the Dayton Street murders. Many of the Lowry Park witnesses were placed in the witness protection program based on the risk that Ray or Owens would 
49 want them killed to keep them from testifying. Thus, while counsel faced formal barriers to contacting and interviewing witnesses — namely, the need to contact them through the prosecution — they faced informal barriers as well. As discussed more fully below, many witnesses were hiding from the defense or were disinclined to grant interviews. Where witnesses decline to have contact with the defense, counsel’s ability to investigate is hampered and a limited investigation is more likely to be deemed adequate. Walls v. Bowersox, 151 F.3d 827, 834 (8th Cir. 1998) (noting that counsel did not render ineffective assistance in a mitigation case where counsel did not present family statements because the family uniformly declined to speak to the defense). ¶ 83 Third, and most importantly, the record shows that Owens’s counsel actually interviewed or attempted to interview nearly all the eyewitnesses before trial, and that they made significant efforts to investigate nearly all the adverse witnesses. For those they did not interview, we conclude that reasonable counsel might not have prioritized these witnesses. ¶ 84 In the initial stages of the investigation, Douglas Wilson and his investigator traveled to Louisiana to interview Owens’s family. 
50 These interviews were done for a dual purpose: to begin mitigation research in the Dayton Street case and to conduct factual research into the relationships between Ray, Owens, and Sailor. In addition, they flew to Michigan to investigate Sailor. Some of her family lived there and she had a potential criminal history in Michigan. Counsel also interviewed Sailor’s family in Colorado. ¶ 85 The defense also quickly interviewed Ray’s brother, Maurice, who was implicated in a scheme to hide the escape vehicle. Defense counsel additionally requested grand jury transcripts and sought prosecutorial help to interview multiple witnesses who were in witness protection. In April 2006, the defense team conducted interviews with eyewitnesses Cashmeir Jones and Askari Martin, both of whom were in witness protection. Martin said he “never saw” Owens but told the defense, “I don’t want to talk to you guys.” The grand jury transcripts, which were disclosed to the defense, revealed that Martin testified he never saw Owens at Lowry but he had seen Ray there and believed he was the shooter. Jones “continually avoided contact” with the defense and was evasive. They also interviewed Teresa Riley, who was well-acquainted with Sailor and was knowledgeable about the Lowry Park shootings, in 
51 April 2006. She stated, “I don’t feel like talking about [Ray] and [Owens].” ¶ 86 The defense twice attempted to interview eyewitness Jamar Dickey. Discovery materials showed that Dickey may have seen Ray shoot Vann. However, attempts to interview Dickey were unsuccessful. In response to counsel’s second attempt to secure an interview, Dickey stated, “good luck trying to find me.” In any case, Kepros testified she had concerns about presenting evidence that Ray was the only shooter because even if the jury believed that, Owens might be liable as a complicitor. ¶ 87 In August, the defense interviewed Sailor, one of the two principal witnesses for the prosecution, and they attempted to interview victim Bell and eyewitness Green. They were unable to reach Bell, and Green refused to speak to the defense; when they stopped him at the courthouse, Green said that he was uncomfortable talking there. ¶ 88 In the last three months before the trial, the defense attempted to contact at least eighteen additional eyewitnesses, many of whom described a shooter who looked like Ray or was dressed like him. 
52 However, these witnesses either denied having useful knowledge, could not be located, or refused to speak to the defense. ¶ 89 Despite these extensive efforts to talk to nearly every eyewitness available, Owens asserts that the investigation was inadequate because counsel did not interview alternative suspects Johnson or Jon Martin. However, it is unlikely that Johnson or Martin would have submitted to an interview with the defense, knowing that they might be suspects and that their testimony was, at least in part, adverse to Owens, who was perceived as dangerous to adverse witnesses. Moreover, it would not have been clear to reasonable counsel that Johnson or Martin would have offered exculpatory testimony beyond that already provided by Johnson or other eyewitnesses — that Owens did not shoot until Vann punched him and that Vann’s shooter might not have resembled Owens.
12 In some cases, where counsel has initial information about what a witness might say, the information dictates that counsel investigate 12 In postconviction testimony, Martin testified he saw Vann’s shooter and he had dark skin, a bald “fade” hairstyle, and gold teeth. However, he did not know who it was. Martin is one of multiple witnesses whose description of the shooter did not match Owens. 
53 further. See Wiggins v. Smith, 539 U.S. 510, 527 (2003) (stating that a court must consider both the quantum of available evidence and whether the known evidence should have reasonably led to further investigation). Here, because these witnesses were highly unlikely to make themselves available or provide important exculpatory testimony, it was reasonable not to prioritize these interviews. ¶ 90 Owens similarly contends that counsel should have interviewed Jahmon Gaines and Michael McPherson, both of whom gave postconviction statements or testimony that they saw Ray shoot Vann. McPherson also testified that Ray shot Marshall-
Fields. Neither of these witnesses knew whether Owens was at the park that night. While this testimony places the blame squarely on Ray, as Kepros noted in her testimony, in light of the strong evidence that Owens came to Lowry Park to help Ray, inculpating Ray did not necessarily exculpate Owens. Owens was likely to be held complicit in Ray’s crimes and, even if he wasn’t, the ballistics evidence indicated there were two different shooters. Therefore, deciding not to prioritize interviews of additional witnesses that 
54 might have pinned one or more of the shootings on Ray was reasonable. 3. Prejudice ¶ 91 After reviewing the reasons that self-defense was a reasonable strategy, and an identity defense was problematic, the postconviction court concluded that “defense of Ray, self-defense was not only a reasonable strategy, but the more reasonable strategy.” Whether this statement is reviewed as a factual determination to which we defer, or a conclusion of law that we review de novo, we agree with the postconviction court. ¶ 92 Although there was some evidence Ray or others may have shot Vann, there was overwhelming evidence that Owens was at the park that night and that he shot Vann in an effort to fend off a group of angry young men. Sailor testified that she had asked Owens to come to Lowry Park to help Ray and that a large group of men had been in a heated argument with Owens and Ray just before the shooting. Johnson also testified that a group of men had been fighting with Owens and Ray and that Vann had struck Owens just before Owens shot him. Marshall-Fields’s and Green’s statements and Bell’s testimony support Johnson’s version of 
55 events. In addition, Sailor testified that when she met up with Ray and Owens after the shootings, Ray was angry at Owens because Owens had decided to turn a fistfight into a gunfight. Multiple victims and eyewitnesses described a shooter that resembled Owens. Finally, shortly after the shootings, Owens and Ray disposed of their clothes and hid the escape vehicle. Owens then cut off his braids and left Colorado. ¶ 93 Although an alternative suspect defense implicating a myriad of others might have been considered by the defense, in light of the strong evidence that Owens had not been misidentified, it was reasonable for the defense to pursue a self-defense strategy, and we agree with the postconviction court that it was the better choice. Much of the postconviction evidence cited by Owens was duplicative of other known evidence showing that several witnesses saw someone resembling Ray shooting at Lowry Park.
13 Counsel’s 13 This includes the potential testimony of McPherson and Gaines, who might have testified that they saw Ray shoot Vann. This testimony was largely cumulative of the testimony of Dickey, who admitted he “probably” told police that he saw Ray shoot Vann, and Askari Martin, who, according to police testimony at trial, identified Ray as the shooter. Martin also testified that he did not see Owens at Lowry Park. 
56 failure to uncover duplicative evidence that Ray was a shooter did not preclude them from making a reasonable decision that an identity defense was unlikely to succeed. Kipp v. Davis, 971 F.3d 866, 879-80 (9th Cir. 2020) (holding that failure to uncover duplicative evidence is not prejudicial). The record demonstrates that there was no reasonable likelihood that a jury would have believed Owens did not participate in the shootings, and his counsel therefore did not prejudice his case by failing to conduct an investigation into alternate suspects. Harrington, 562 U.S. at 108. V. Juror Misconduct ¶ 94 Next, Owens contends that Juror 75’s “misconduct” deprived him of due process and a fair and impartial jury. The postconviction court identified four types of alleged misconduct by Juror 75, separately and exhaustively evaluated each one, and concluded that Owens was not entitled to relief under any of the four assertions, separately or cumulatively. We describe those findings in Part V.A. On appeal, Owens maintains that the postconviction court erred by limiting postconviction hearings — an argument addressed and rejected in Part II — and with respect to its findings and conclusions as to each type of alleged misconduct. 
57 ¶ 95 Before we recount the court’s findings, we first consider a “fact” Owens alleged at the beginning of his oral argument — that Juror 75 knew the murder victim, Vann. Juror 75 did not testify that she knew Vann, and the postconviction court did not make an explicit finding about this. Our de novo review of the evidence referenced by Owens reveals minimal support for this alleged fact in postconviction testimony from Juror 75’s son Q.E. He testified that Vann, a high school friend of his, had been to his house four or five times, as recently as 2002 (five years before trial). He further testified that Vann had “possibly” eaten at his house, and that if so, Juror 75 would have been home and he would have introduced Vann to her. But even if they had met, Juror 75 most likely would not have learned Vann’s actual name, since, according to Q.E., most of his friends used nicknames. Evidence of a possible introduction does not lead to a conclusion that Juror 75 “knew” the murder victim in this case. A. Postconviction Order 1. Relationship with Marshall-Fields’s Uncles ¶ 96 Owens alleged that Juror 75, through her husband, Mr. Manuel, had a personal friendship with two of Marshall-Fields’s 
58 uncles, Alan Baxter and Michael Baxter, and she failed to disclose that to the trial court or the attorneys at any time until after the trial.
14 The postconviction court found that the “evidence overwhelmingly demonstrate[d]” that Juror 75 did not know either of the uncles “until well after her jury service was concluded,” and, therefore, her friendship with them could not and did not have any influence on her jury service in this case. 2. Dayton Street Murders Connection ¶ 97 Charges arising from the Dayton Street murders were pending against Owens at the time of his Lowry Park trial. The trial court ordered that no information regarding the Dayton Street case was to be disclosed at the Lowry Park trial. In his postconviction motion, Owens asserted that Juror 75 knew of the Dayton Street case prior to, or during, deliberations in this case, and she may have disclosed Owens’s alleged involvement in the Dayton Street case to other jurors. Owens contends that this extraneous information tainted the jury deliberations. 14 Juror 75 married this husband many years after the Lowry Park trial. 
59 ¶ 98 The postconviction court found that there was conflicting evidence in Juror 75’s testimony about when she had connected the two cases. Nonetheless, the postconviction court found that, although Juror 75 had some knowledge about the Dayton Street murders at some point in time, there was no evidence showing that she connected Owens to those murders or that she shared any information about Dayton Street with other jurors. The postconviction court thus concluded that Owens had failed to prove that “any extraneous information was introduced into the jury deliberation process.” 3. Juror 75’s Questionnaire ¶ 99 Owens asserted that Juror 75 was not honest in completing the jury questionnaire because she did not fully answer several questions that sought information about prior involvement with judicial processes, she did not truthfully reveal her education and occupational background, and she did not indicate on an attachment to the questionnaire that she recognized the names of potential witnesses. As a result of these alleged nondisclosures, Owens contends that he was not prompted to ask questions during 
60 voir dire that would have revealed Juror 75’s awareness that Q.E. had been wounded twice in suspected gang-related shootings. ¶ 100 The postconviction court found that Juror 75’s incomplete answers were not intentional falsifications and that the omitted information was not material or of “constitutional consequence.” 4. Failure to Disclose Recognition of Individuals at Trial ¶ 101 Owens contends that several trial events indicate Juror 75’s dishonesty or failure to disclose information to the trial court. ¶ 102 At postconviction hearings, Juror 75 testified that (1) during the trial she noticed a woman, whom she knew as Melissa White, sitting in the gallery; (2) when Marshall-Fields’s mother testified at the trial, she recognized Ms. Fields as a person who had spoken at her church about the Dayton Street killings; (3) she recognized faces in the courtroom; and (4) she encountered one of the witnesses, Dickey, at Q.E.’s apartment during the trial. ¶ 103 The postconviction court made the following specific findings: • Juror 75 knew and liked White; at some point during the trial, White told her she was Owens’s friend. 
61 • While Juror 75 did not have a personal relationship with any of the witnesses, during the trial she recognized the faces of at least three of them. • She attempted to bring her recognition of faces to the attention of the court, but Owens’s trial counsel chose not to interview her. • She was concerned for her sons’ safety and her own because she recognized faces of people who she suspected might have gang involvement. • She did not converse with Dickey at Q.E.’s apartment; Dickey said he had seen her in court and left immediately after her arrival.
15 • After that encounter, Q.E. told her that his homeboys were testifying and that if she had been seeing his friends testify, she needed to get herself excused from 15 The postconviction court found on conflicting evidence that this occurred on or after January 23, 2007, when Judge Spear brought Juror 75’s connection with White to the attorneys’ attention. However, Juror 75 testified that Dickey said, “I saw you in court today,” and Dickey testified on January 19, 2007. 
62 juror service. She told him that she had tried to get off the jury, but the court had told her that she was to stay. • Sometime after the Lowry Park shootings, Q.E. told her that there had been a shooting at Lowry Park. Knowing that many in their late teens and early twenties attended the event, and that Q.E. did not tell her about everything he was involved in, she looked for him when the video of the Lowry Park event was shown to the jury. ¶ 104 The postconviction court concluded that Juror 75 had made a reasonable good faith effort to notify the trial court that she recognized White and others in the courtroom, but neither the trial court nor the attorneys understood the full extent of these matters because the court did not conduct an in camera interview as requested by the prosecution. Nonetheless, the postconviction court concluded that Owens “ha[d] not shown he was deprived of a fair trial due to Juror 75’s recognition of witnesses and courtroom observers, nor due to her concern for her son’s safety and her own.” B. Applicable Law ¶ 105 The Due Process Clauses of the United States and Colorado Constitutions guarantee every criminal defendant the right to a fair 
63 trial. See U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 16, 25; see also Morrison v. People, 19 P.3d 668, 672 (Colo. 2000). An impartial jury is a fundamental element of the constitutional right to a fair trial. Morrison, 19 P.3d at 672. ¶ 106 When a juror’s nondisclosure of information during jury selection arises from actual bias, a defendant may be entitled to a new trial. Where, for example, a juror deliberately misrepresents important biographical information relevant to a challenge for cause or a peremptory challenge, or knowingly conceals a bias or hostility toward the defendant, a new trial might well be necessary. People v. Dunoyair, 660 P.2d 890, 895 (Colo. 1983). In such instances, the juror’s deliberate misrepresentation or knowing concealment is itself evidence that the juror was likely incapable of rendering a fair and impartial verdict in the matter. Id. ¶ 107 The United States Supreme Court, in a civil case, has recognized that a juror’s failure to disclose information may indicate actual bias. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 
64 548 (1984).
16 The Supreme Court held that to obtain a new trial in this situation, a party must (1) demonstrate that a juror failed to honestly answer a material question on voir dire and (2) show that a correct response would have provided a valid basis for a challenge for cause. Id. at 556. But the Court clarified that a juror’s “mistaken, though honest response to a question” is not a basis for a new trial, because [a] trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination. Id. at 555. ¶ 108 In the criminal case Sampson v. United States, 724 F.3d 150 (1st Cir. 2013), the circuit court explained that the test under the second prong of McDonough comes down to a basic question: 16 McDonough, being a civil case, did not turn on the constitutional right to a jury trial in a criminal proceeding. Thus, we are not convinced it governs in Owens’s case. Nonetheless, because the postconviction court addressed it, and both sides on appeal argue the application of McDonough, we will address it. 
65 “whether a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror’s dishonesty, would conclude under the totality of the circumstances that the juror lacked the capacity and the will to decide the case based on the evidence.” Id. at 165-66. This is evidence of “actual bias.” ¶ 109 Sampson identified a number of factors that may be relevant in determining whether a juror has both the capacity and the will to decide the case solely on the evidence. This compendium may include (but is not limited to) the juror’s interpersonal relationships, the juror’s ability to separate her emotions from her duties, the similarity between the juror’s experiences and important facts presented at trial, the scope and severity of the juror’s dishonesty, and the juror’s motive for lying. Although any one of these factors, taken in isolation, may not provide sufficient support for a challenge for cause, their cumulative effect must nonetheless be considered. Id. at 166. ¶ 110 Similar actual bias rules apply when, during the trial, a seated juror recognizes a witness. In People v. Christopher, 896 P.2d 876 (Colo. 1995), after jury selection and opening statements, one of the 
66 jurors notified the bailiff that she recognized the prosecution’s advisory witness as a former neighbor and friend. The supreme court, quoting Dunoyair, 660 P.2d at 896, stated that “[a]bsent a showing that a juror’s prior acquaintance with a witness created an actual bias, ‘we will assume that the juror followed the instructions of the court and decided the case solely on the basis of the evidence and the law.’” Christopher, 896 P.2d at 879. ¶ 111 The Christopher court identified five factors
17 to consider in determining whether, under these circumstances, a juror should be replaced with an alternate: (1) the juror’s assurance of impartiality; (2) the nature of the information withheld in voir dire; (3) whether the nondisclosure was deliberate; (4) any prejudicial effect the nondisclosed information would have had on either party, including the defendant’s right to exercise peremptory challenges; and (5) the practical remedies available when the nondisclosure is revealed. Id. 17 In Christopher, the juror disclosed her familiarity with a witness during trial, the defense requested she be replaced with the alternate juror, and the court had the opportunity to consider whether replacement was required. In Owens’s case, the full extent of Juror 75’s acquaintance with witnesses was not known until the Rule 35 proceeding, but to the extent we can apply these factors at this stage, we conclude that the test still applies. 
67 ¶ 112 Separate from actual bias as discussed above, implied bias can be a basis for challenging a juror and granting a new trial. ¶ 113 Statutory implied bias requires excusal of a prospective juror due to statutorily defined connections to the crime or to trial participants. See § 16-10-103(1)(b)-(i), (k), C.R.S. 2020. These challenges must be based on the plain language of the statute or rule, not judicial attempts to discern the spirit of the rule or intent of the legislature. People v. Bonvicini, 2016 CO 11, ¶ 17 (noting that implied biases “apart from the statutory scheme” do not exist; we “apply the plain language of section 16–10–103(1)(k) as written” (quoting People v. Rhodus, 870 P.2d 470, 477 (Colo. 1994))). ¶ 114 Another form of implied bias, recognized by some federal courts, is “common law implied bias.”
18 Federal common law may provide grounds, albeit in extremely rare circumstances, for finding implied bias not involving deliberate juror dishonesty and not expressly covered by a statute or rule. A determination of common 18 In Dennis v. United States, 339 U.S. 162, 171 (1950), the Supreme Court declined to recognize implied juror bias as a basis for reversal of a conviction. The parties have not referenced, nor have we found, a Colorado supreme court case recognizing the doctrine of implied bias. 
68 law implied bias “turns on an objective evaluation of the challenged juror’s experiences and their relation to the case being tried.” Gonzales v. Thomas, 99 F.3d 978, 987 (10th Cir. 1996). And it involves a determination of “whether an average person in the position of the juror in controversy would be prejudiced.” United States v. Powell, 226 F.3d 1181, 1188 (10th Cir. 2000)). Thus, a finding of common law implied bias “is appropriate where the juror, although she believes that she can be impartial, is so closely connected to the circumstances at issue in the trial that bias is presumed.” Id. (quoting United States v. Cerrato-Reyes, 176 F.3d 1253, 1260 (10th Cir. 1999)). An appropriate finding of common law implied bias is rare,
19 and it is unclear whether Colorado even recognizes implied bias outside those categories specified in section 16-10-103. See Bonvicini, ¶ 17. 19 In Gonzales v. Thomas, 99 F.3d 978, 987 (10th Cir. 1996), the Tenth Circuit stated that the common law implied bias doctrine should not be invoked lightly. See also Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988) (characterizing the extreme situations for which the doctrine is reserved as those where “the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances”). 
69 C. Standard of Postconviction Review ¶ 115 In reviewing a Rule 35(c) claim, “we presume the validity of the conviction and the defendant bears the burden of proving his claims by a preponderance of the evidence.” Dunlap, 173 P.3d at 1061. ¶ 116 Actual bias is a factual matter; we thus give great deference to the postconviction court’s findings. See People v. Garcia, 2018 COA 180, ¶ 16 (applying an abuse of discretion standard on direct appeal); see also Powell, 226 F.3d at 1188 (holding that findings regarding actual bias are reviewed for clear error). Implied bias is a matter of law, and we review these findings de novo. Powell, 226 F.3d at 1188 (“Findings as to implied bias are reviewed de novo.”); cf. People v. Novotny, 2014 CO 18, ¶ 53 (de novo review applies to statutory implied bias). D. Discussion ¶ 117 We first consider whether any one of the four separate alleged areas of misconduct by Juror 75 warrants a new trial. We then consider the cumulative effect of the alleged misconduct. 1. Relationship with Marshall-Fields’s Uncles ¶ 118 Owens alleges that Juror 75 had a relationship with two uncles of Marshall-Fields at the time of trial, which indicates a 
70 likely bias against Owens. The postconviction court dismissed this allegation because it found that Juror 75 did not know the uncles at the time of the trial. ¶ 119 On appeal, Owens asserts that the postconviction court erred because Juror 75’s alleged significant other at the time of trial, Manuel, knew the uncles before the trial; her sons were friends with the uncles’ sons; and the postconviction court refused to reopen the postconviction hearing, denying Owens the chance to fully develop this evidence.
20 ¶ 120 We agree with the postconviction court that Owens’s offers of proof and testimony received tend to show that Juror 75 had a relationship with Manuel that predated the trial and that Manuel had a relationship with the uncles. However, even if the offers of proof submitted to the postconviction court are treated as evidence, they do not show that Juror 75 knew the uncles or their relationship to the victim at the time of trial. 20 The record disproves this last contention. The court took a full day of additional testimony and heard from five witnesses, including both uncles. 
71 ¶ 121 As the postconviction court correctly noted, a verdict cannot be impeached based upon knowledge obtained by a juror after returning a verdict. People v. Thornton, 712 P.2d 1095, 1099 (Colo. App. 1985), rev’d, 716 P.2d 1115 (Colo. 1986). We cannot conclude that the postconviction court erred in finding Juror 75 did not harbor an actual bias based on a future relationship with a victim’s uncles, and we cannot conclude that the future relationship constituted (1) implied bias under section 16-10-103, or (2) an exceptional circumstance meriting a finding of federal common law bias, even if we apply that doctrine. 2. Dayton Street Murders Connection ¶ 122 Owens alleged that Juror 75 knew of the Dayton Street murders during the deliberations in this case and shared her knowledge with other jurors, thus introducing improper extraneous information into the deliberations. The postconviction court rejected this argument, finding that no extraneous information was introduced into the jury deliberations. ¶ 123 Any information that is not properly received into evidence or included in the court’s instructions is extraneous to the case and improper for juror consideration. People v. Harlan, 109 P.3d 616, 
72 624 (Colo. 2005). And while CRE 606(b) precludes inquiry into statements occurring during jury deliberations, the rule excepts inquiry into “whether extraneous prejudicial information was improperly brought to the jurors’ attention.”
21 ¶ 124 When extraneous information is alleged to have been considered by a jury, the cases establish a two-part inquiry. First, the court makes a determination whether extraneous information was improperly before the jury; and second, if extraneous 21 The postconviction court’s findings on this issue relied, in part, on testimony from Juror 75. On appeal, Owens appears to argue that inquiry into Juror 75’s knowledge violated the proscription of CRE 606(b) against juror testimony regarding the course of a jury’s deliberations. We reject this argument with respect to extraneous information. In evaluating assertions of improper extraneous information, the courts may consider evidence from jurors regarding the source of the extraneous information, the manner of its acquisition, its content, and its presence and use in the jury room during deliberations. People v. Harlan, 109 P.3d 616, 625 (Colo. 2005) (first citing People v. Wadle, 97 P.3d 932, 937 (Colo. 2004); and then citing Wiser v. People, 732 P.2d 1139, 1141 (Colo. 1987)). Evidence relevant to the existence of extraneous information is admissible under the CRE 606(b) exception for evidence regarding extraneous information improperly before the jury. Harlan, 109 P.3d at 625. However, “the court may not take into account testimony regarding the jury’s deliberations, a juror’s mental processes leading to his or her decision, or whether the extraneous information actually swayed any of the particular jurors’ votes.” Id. 
73 information was introduced, it applies an objective “typical juror” standard to determine whether that information posed the reasonable possibility of prejudice to the defendant. Harlan, 109 P.3d at 624. ¶ 125 We are bound by the postconviction court’s factual findings on this issue unless they are clearly erroneous. See id. The postconviction court found: Juror 75’s limited knowledge [of the Dayton Street murders] could only be significant if she first inferred that Marshall Fields was one of the . . . victims, then inferred that Owens was involved in the Dayton Street murders and then allowed her inferences to influence her verdict against him in the Lowry park trial. This court finds that Juror 75 did not connect Owens to the Dayton Street murders until after the Lowry Park verdict was decided. ¶ 126 The postconviction court also found that “any knowledge that Juror 75 may have had about the Dayton Street murders played no part in either hers or any other juror’s consideration of the case.” This is so, the postconviction court concluded, because even if Juror 75 realized that Marshall-Fields must have been one of the Dayton Street victims, “she did not have information directly connecting Owens to the Dayton Street murders.” The court also 
74 found, based on testimony from Juror 75 and two other jurors, that Juror 75 did not mention anything about the Dayton Street murders to her fellow jurors. ¶ 127 Owens contends on appeal that these factual findings are clearly erroneous. We disagree because we find support for these facts in the record.
22 Because no extraneous information about the Dayton Street murders was improperly before the jury, we need not inquire about a reasonable possibility of prejudice to Owens. Owens’s assertions regarding Juror 75’s knowledge of the Dayton Street murders do not warrant postconviction relief. 3. Juror 75’s Questionnaire ¶ 128 Owens argued to the postconviction court that Juror 75 failed to honestly complete the jury questionnaire and thereby failed to disclose information that would have led the defense attorneys to question her during voir dire, which in turn would have led to her 22 Owens’s brief asserts that Juror 75 had knowledge of the Dayton Street murders but offers no showing that Juror 75 connected Owens to those murders. He also notes that Juror Kloster testified that Juror 75 said she knew about the Dayton Street shootings and was afraid for her safety. But significantly, Juror Kloster testified that this disclosure was made after the jury returned its verdict. 
75 disqualification for cause or removal by peremptory challenge. The postconviction court rejected this argument because none of the omitted information was intentionally withheld, and it was not material or of constitutional significance.
23 ¶ 129 On appeal, Owens continues to press his argument that Juror 75’s nondisclosures on the questionnaire warrant a new trial. ¶ 130 But, as held in McDonough and discussed above, a juror’s failure to disclose information that would have provided a basis for peremptory excusal is not sufficient to garner a new trial. The objecting party must show that the nondisclosed information would have provided the basis for a challenge for cause. McDonough, 464 U.S. at 556. We conclude that none of Juror 75’s nondisclosures would have provided a basis for a causal challenge. ¶ 131 Section 16-10-103 and Crim. P. 24(b) set forth eleven specific bases for challenges for cause. As noted above, only the plain 23 By these terms, we interpret the postconviction court to mean that Juror 75’s omissions did not show that she decided the case based on extraneous evidence or that she was prejudiced in favor of the prosecution. 
76 language of those bases support challenges for cause based on implied bias.
24 See Bonvicini, ¶ 17. ¶ 132 Owens does not contend that Juror 75’s answers, even if complete, would have provided a valid challenge for cause on any of these eleven bases. Rather, he argues that Juror 75’s overall dishonesty in answering the questions violated an obligation to answer the questions truthfully. That obligation, Owens claims, arises from the language of section 16-10-103(2). But section 16-10-103(2) does not state that prospective jurors must answer questions “truthfully;” rather, it states, “[i]f any juror knows of anything which would disqualify him as a juror or be a ground for challenge to him for cause, it is his duty to inform the court concerning it whether or not he is specifically asked about it.” (Emphasis added.) ¶ 133 The postconviction court expressly found that Juror 75 did not intentionally provide false information on the questionnaire or fail 24 And it is now clear under federal and Colorado law that the deprivation of an opportunity to exercise a peremptory challenge does not violate a defendant’s constitutional rights. See People v. Novotny, 2014 CO 18, ¶¶ 22-23. 
77 to disclose information “she knew would disqualify her as a juror.” Nonetheless, Owens argues that had Juror 75 revealed she and her family members had been crime victims, or that her close family members had prior convictions, or that her son had a juvenile delinquency proceeding, further questioning would have followed and a challenge for cause would have been granted. ¶ 134 These nondisclosures do not fit within any of the statutorily recognized bases for challenges for cause, so excusal based on honest disclosures would remain in the trial court’s discretion. On appeal, we review whether “under the totality of the circumstances . . . the juror lacked the capacity and the will to decide the case based on the evidence.” Sampson, 724 F.3d at 165-66. We agree with the postconviction court that Owens failed to prove this by a preponderance of the evidence. ¶ 135 Moreover, to the extent that Juror 75’s direct and indirect encounters with the justice system may evince enmity toward the State, such enmity would not prejudice Owens. See § 16-10-103(1)(j). 
78 4. Failure to Disclose Recognition of Individuals at Trial ¶ 136 In his postconviction motion, Owens identified a litany of alleged nondisclosures by Juror 75 that he argues shows dishonesty and actual or common law implied bias justifying a new trial. The postconviction court meticulously reviewed each of these allegations and concluded that Juror 75 was “not deliberately dishonest,” and under the totality of the circumstances, Owens did not show that Juror 75 “lacked the capacity and the will to decide the case based on the evidence,” and therefore, Owens had not shown he was prejudiced.
25 ¶ 137 On appeal, Owens submits that the postconviction court’s finding as to Juror 75’s honesty is clearly erroneous. Alternatively, Owens contends that the court’s conclusion that he was not prejudiced is error as a matter of law. ¶ 138 With respect to actual bias, we find ample support in the record, as described below, for the postconviction court’s finding 25 In reaching these conclusions, the postconviction court applied the “compendium” of five factors listed in Sampson v. United States, 724 F.3d 150, 166 (1st Cir. 2013). 
79 that Juror 75 was not actually biased. We thus defer to that finding. See Garcia, ¶ 16. ¶ 139 With respect to common law implied bias, we agree with the special concurrence that this doctrine may not apply in Colorado. See Bonvicini, ¶ 17. Colorado recognizes implied bias for specific categories defined in section 16-10-103, but Juror 75’s alleged relationships do not fall into any of those categories. Nevertheless, we analyze Owens’s arguments with respect to this doctrine in the event that it may be grounded in the United States Constitution. ¶ 140 While Owens’s allegation of common law implied bias arises from numerous nondisclosures, the postconviction court facilitated our review by providing specific findings that summarize the allegations of conduct that could amount to implied bias.
26 We agree with the postconviction court that unlike the situation in Dunoyair, Christopher, McDonough, or Sampson, where the alleged failure to disclose involved a “single experience or relationship,” this case involves numerous apparent nondisclosures. Owens asserts 26 In his appellate brief, Owens recites these findings and we assume he agrees with at least these findings. 
80 that even if none of these would individually be sufficient to show implied bias, collectively they are sufficient to allow an inference of implied bias, notwithstanding Juror 75’s assertion that she served without bias. ¶ 141 To decide this question, we look collectively at the incidents referenced in the postconviction court’s footnote 36, as well as other events alleged by Owens. Like the postconviction court, we see this as a “troubling dilemma” because had all of this information come to the attention of the attorneys and the court during the trial, an alternate may have been seated in Juror 75’s place.
27 But the information did not come out in a timely manner; and now through hindsight we have to decide how to address Owens’s claims. In reaching this answer we are mindful, as was the postconviction court, that “[a] defendant is entitled to a fair trial, but not a perfect trial.” People v. Rodriguez, 794 P.2d 965, 971 (Colo. 1990). When a defendant has received a fair, albeit imperfect, trial, the law strongly 27 Indeed, the trial judge so stated in his affidavit filed with the postconviction court. 
81 favors finality.
28 People v. Wiedemer, 852 P.2d 424, 434 (Colo. 1993) (“[T]he State has a legitimate interest in preserving the finality of criminal convictions . . . .”); see People v. Thomas, 195 P.3d 1162, 1164 (Colo. App. 2008) (noting that Crim. P. 35 had been amended to favor finality); see also, e.g., West v. People, 2015 CO 5, ¶¶ 13, 53, 55 (noting public interest in finality of verdicts). ¶ 142 Despite the postconviction court’s finding that Juror 75 did not deliberately withhold pertinent information either in her questionnaire answers or during the course of trial, Owens urges us to find that Juror 75 was intentionally evasive, and at worst dishonest, in her course of conduct. We will assume, for purposes of analysis, that for some period of time Juror 75 may have been withholding information that should have been disclosed, particularly the points listed by the postconviction court in footnote 36. The postconviction court found that Juror 75 did not realize 28 We are also mindful of the statement by the United States Supreme Court in Smith v. Phillips, 455 U.S. 209, 217 (1982): “[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.” 
82 the significance of the information or did not know how to advise the court of her knowledge. ¶ 143 But the key event is that when Juror 75 recognized White in the courtroom, she approached the courtroom bailiff and disclosed that she recognized “faces.” This is important evidence that Juror 75 was not deliberately concealing information. Had the full extent of her recognition been made known, the problem could have been addressed at that time.
29 ¶ 144 Juror 75 testified at the postconviction hearings; the postconviction court found her 2015 testimony to be a more accurate reflection of what occurred during trial. According to her 2015 testimony, Juror 75 recognized White in the courtroom gallery 29 Owens further asserts that the postconviction court’s finding that Juror 75 had reported recognizing multiple people at trial raises a new issue — Judge Spear’s failure to effectively communicate Juror 75’s recognition of multiple people deprived Owens of his rights to counsel and to be present at trial during the critical stage of ex parte communication between the court and the juror through the court’s bailiff. We do not agree that Judge Munch found that there were undisclosed ex parte communications, and we decline to make that factual finding on appeal. Moreover, we perceive the court’s communications to be sufficient to alert the parties that further inquiry was necessary, such that Owens was not denied due process or fundamental fairness. Owens did not request the opportunity to question Juror 75, even though the prosecution did. 
83 and told the court bailiff, “I knew Melissa White’s name and I knew other faces that were out there, not that they were a witness.” The subsequent sequence of events is detailed at length in the postconviction court’s order, but rather than restating, we refer to the postconviction court’s findings: The court finds that, as the trial was progressing, Juror 75 found faces to be familiar although, other than White, she could not immediately place them. As the trial proceeded, she came to realize that they were former or current friends of her son. She attempted to bring the matter to the attention of the judge, but was denied the opportunity to talk to him and was directed to remain on the jury. . . . . Juror 75 made a reasonable good faith effort to bring to the attention of the court her recognition of White and others in the courtroom. These matters did not come to the attention of the court and attorneys because the court chose not to conduct the in camera interview that had been requested by the juror and, later the prosecution. 
84 ¶ 145 The postconviction court noted that it would have been preferable for the trial court to have spoken to Juror 75, and if it had done so, it would have learned more detailed information.
30 ¶ 146 Those undisclosed matters might have provided a basis for excusing Juror 75, but as the postconviction court recognized, the issue on appeal is not whether Juror 75 should have been, or would have been, excused. The issue is whether Juror 75’s service deprived Owens of a trial by an impartial jury. ¶ 147 Before answering this question, the postconviction court again summarized the evidence relating to Juror 75: Juror 75 recognized witnesses, but did not know their names and did not have a relationship with any of them. Two were people whom she felt had been, and might still be, friends of her son from whom she was partially estranged. She recognized Fields as a woman who had spoken to the congregation of her church, but she did not know Fields’s name and had no relationship with her. She had a relationship with White and knew White was a friend of Owens, but White was not a witness. 30 Even if we assume misconduct on the part of the court bailiff, or the trial judge, Owens still must establish that he was prejudiced by this misconduct. People v. Hernandez, 695 P.2d 308, 310 (Colo. App. 1984). 
85 ¶ 148 Based on this evidence, the postconviction court found that “Owens has not shown that he was deprived of a fair trial due to Juror 75’s recognition of witnesses and courtroom observers, nor due to her concern for her son’s safety and her own.” We find support in the record for the court’s finding. 5. Cumulative Effect ¶ 149 Whether Owens was deprived of a fair trial is a conclusion of law that we must consider de novo. But we must defer to historical findings of fact that underly that conclusion of law. For the following reasons, we agree with the postconviction court’s conclusion that Owens received a fair trial. ¶ 150 First, the postconviction court found, with record support, that Owens’s conviction was based on the evidence presented, and not on extraneous information. ¶ 151 Second, the postconviction court correctly applied Sampson, made the factual findings listed in footnote 35 of its order, and found that Juror 75 did not lack the capacity and the will to decide the case based on the evidence. She was not actually biased. ¶ 152 Third, and importantly, Juror 75’s disclosure to the bailiff, though ultimately incomplete as conveyed to counsel, demonstrates 
86 that she did not seek to improperly remain on the jury. She did not conceal from the court the recognition of various persons in the courtroom, nor did she misrepresent her connections to them. Moreover, these connections did not constitute implied bias under section 16-10-103. ¶ 153 Finally, even if we were to consider the doctrine of implied common law bias, we would conclude that the circumstances here are not the sort of extreme circumstances to which the doctrine applies. See Gonzales, 99 F.3d at 987 (The common law implied bias doctrine should not be invoked lightly; it must be reserved for those “extreme” and “exceptional” circumstances that “leav[e] serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.” (quoting Smith v. Phillips, 455 U.S. 209, 222 (1982) (O’Connor, J., concurring))). Juror 75 did not have an existing relationship with any witness or a close connection to the crime. See Smith, 455 U.S. at 222 (O’Connor, J., concurring) (suggesting that extreme situations that would support a finding of implied bias “might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative 
87 of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction”). And courts have declined to find implied bias when a juror was personally acquainted with a witness, provided no actual bias existed. See, e.g., United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir. 1986) (stating that jurors knew government witnesses). ¶ 154 We conclude that Juror 75’s jury service did not deprive Owens of a fair trial. See Christopher, 896 P.2d at 879. In reaching this conclusion, we do not consider Juror 75’s postconviction assurances of impartiality in deference to CRE 606(b). See id. VI. Ineffective Assistance of Appellate Counsel ¶ 155 Finally, Owens contends that his appellate counsel in Owens I were ineffective for failing to raise a DeBella issue — an issue he asserts was more likely to succeed on appeal than the issues actually raised.
31 See DeBella v. People, 233 P.3d 664 (Colo. 2010). 31 Owens identified additional issues not raised on direct appeal in his postconviction motion, but he has abandoned those issues in his Rule 35(c) appeal. See People v. Osorio, 170 P.3d 796, 799 (Colo. App. 2007). 
88 ¶ 156 At trial, witness Jeremy Green testified that he could not remember the events of the day of the shooting. The trial court admitted the entire videotape of Green’s police interview into evidence, as well as a transcript of the interview, over Owens’s objection. Later, the trial court ruled, again over Owens’s objection, that it would allow the jurors unfettered access to both the video and the transcript during their deliberations. ¶ 157 The postconviction court found that this latter ruling was error in light of supreme court decisions subsequent to the trial court’s 2004 ruling but prior to the filing of the opening brief on direct appeal. See id. at 668 (“[T]he trial court’s failure to assess the potential for undue prejudice with respect to the jury’s access to [video evidence] was a failure to exercise its discretion” and therefore an abuse of discretion.); see also Frasco v. People, 165 P.3d 701, 704-05 (Colo. 2007). The postconviction court concluded, however, that there was no reasonable probability that an appellate court would have found this error to be grounds for reversal, and accordingly rejected this argument as grounds for relief under Rule 35(c). We agree with the postconviction court’s conclusion. 
89 A. Applicable Law ¶ 158 Claims that appellate counsel overlooked “a meritorious argument that was more likely to succeed than the argument presented” may prevail on postconviction review. People v. Trujillo, 169 P.3d 235, 238 (Colo. App. 2007). However, even a properly objected-to error of allowing unfettered jury access to an exhibit “will be disregarded as harmless if that error did not substantially influence the verdict or affect the fairness of the trial proceedings.” Ray v. People, 2019 CO 21, ¶ 16; see Strickland, 466 U.S. at 694. And to satisfy the prejudice prong of Strickland for ineffective assistance of appellate counsel, “the defendant must demonstrate meritorious grounds for reversal.” People v. Dunlap, 124 P.3d 780, 795 (Colo. App. 2004). ¶ 159 A trial court must exercise discretion in permitting testimonial exhibits to be viewed by deliberating juries, “to guard against their being given undue weight or emphasis.” Ray, ¶ 16. Failure to control jury access to exhibits is “most problematic where the jury’s ultimate determination would necessarily turn on its assessment of the credibility of witnesses, as distinguished from the force of real, or demonstrative, evidence.” Id. at ¶ 18. The assessment of the 
90 credibility of witnesses is most acute where resolution turns on one witness’s account of the crime — the “linchpin” of the prosecution’s case — as the “only person other than the defendant to have purportedly witnessed the crime denied by him, which account is both contradictory of the principal defense and the only testimonial account the jury is permitted to repeatedly view.” Id. B. Discussion ¶ 160 In Ray, as in this case, the trial court permitted the jury unfettered access to the very same videotaped interview of Green. In that case, the supreme court, relying on Frasco and DeBella, concluded that the trial court had erred by allowing unfettered access to the Green interview without any exercise of discretion. Ray, ¶ 15. However, the supreme court concluded that there was not a reasonable possibility that allowing the jury to view the exhibit during deliberation adversely affected the verdict or affected a substantial right of the defendant. Id. at ¶ 23. ¶ 161 In this case, Green’s testimony was not a linchpin of the prosecution’s case; he was not the only person other than Owens to witness the crime, nor was his account necessarily contradictory to the principal defense. In his interview, Green disclosed that he saw 
91 Owens shoot Vann; at trial, Owens did not deny shooting Vann but argued that the shooting was self-defense. Moreover, the events described in the Green interview were corroborated by other evidence provided by several witnesses, as described below. Thus, there was little risk of the jury giving undue weight to the Green interview. ¶ 162 Here, as in Ray, the finding of Owens’s guilt did not turn on the credibility of conflicting testimony between the defendant and Green. See id. at ¶ 20. Rather, there was ample testimony from other witnesses to the shooting. ¶ 163 Marshall-Fields’s police interview corroborated Green’s. His description of the shooter matched Owens’s appearance as described by Green. He also stated, as had Green, that the shooter shot Vann multiple times at close range, was right handed, and had escaped in a gold Suburban vehicle. ¶ 164 Elvin Bell provided a description of the shooter that was similar to the one provided by Marshall-Fields, and similarly described the shooter’s escape in a gold vehicle. ¶ 165 Johnson, who knew Owens prior to the shooting, testified that Vann ran up to Owens, swung his fist, and hit Owens, whereupon 
92 Owens pulled out his gun and shot Vann multiple times. Johnson also testified that Owens left with Ray in the gold-colored Suburban. ¶ 166 Green’s interview was also relevant to the reasonableness of Owens’s claim of self-defense. Green explained that none of the attendees had any weapons at all, and the event was intended to be violence free. But Green’s interview was not the only evidence of these facts; both Johnson’s and Dickey’s testimony corroborated what Green said in the interview. Moreover, because Green’s statements tended to corroborate Johnson’s description of the events immediately prior to the shooting, in which he described Vann’s attack on Owens, the Green interview was helpful in that it provided Owens with evidence to support his self-defense theory. ¶ 167 Because Green’s interview was only one brick in the wall of the prosecution’s case, neither substantially helpful nor harmful, we conclude, as the supreme court did in Ray, that allowing the jury unfettered access to the interview did not affect a substantial right of Owens. See id. at ¶¶ 22-23. Thus, if the DeBella issue had been raised on appeal, there is no reasonable possibility that an appellate court would have reversed on that basis. It follows that the 
93 unraised DeBella issue did not constitute meritorious grounds for reversal, and we cannot conclude that appellate counsel was ineffective in failing to raise it. See Dunlap, 124 P.3d at 795. VII. Conclusion ¶ 168 We affirm the postconviction court’s order. JUDGE WELLING concurs. JUDGE BERGER specially concurs. 
94 JUDGE BERGER, specially concurring. ¶ 169 I agree with virtually all of the majority’s analysis and its disposition. I write separately only to explain why I reject Owens’s claim that he was deprived of a fair trial by Juror 75’s participation in the trial. ¶ 170 As I read the governing Colorado law, to obtain postconviction relief based on allegations that a deliberating juror should not have served, a defendant must establish that either the juror was actually biased within the meaning of section 16-10-103(1)(j), C.R.S. 2020, or impliedly biased as defined by section 16-10-103(1)(a)-(i), (k). ¶ 171 None of the implied bias disqualifications prescribed by statute are applicable here. See id. That leaves only actual bias. See § 16-10-103(1)(j). Actual bias is a question of fact, and appellate courts “defer to the trial court’s findings of fact unless they are so clearly erroneous as to find no support in the record.” Sanchez-
Martinez v. People, 250 P.3d 1248, 1254 (Colo. 2011). “Such deference to the fact finding authority of trial courts reflects our recognition that a trial court is in a unique position to determine the credibility of witnesses and to weigh conflicting evidence in 
95 determining historical facts.” People v. Jordan, 891 P.2d 1010, 1018 (Colo. 1995). ¶ 172 This is not to say that from a juror’s close contacts with witnesses or other people involved in the case, a postconviction court could not find actual bias. Indeed, such contacts and reasonable inferences drawn therefrom are highly relevant and may support a finding of actual bias. But here, after considering extensive evidence and testimony, including testimony by Juror 75 and other jurors, the postconviction court determined, as a matter of fact, that Juror 75 was not actually biased. That finding is supported by the record, and we are bound by it. Sanchez-
Martinez, 250 P.3d at 1254. ¶ 173 In short, none of the statutory implied bias disqualifications are present here, and the postconviction court found no actual bias. Therefore, Owens has not met his burden to obtain postconviction relief based on Juror 75’s participation in his trial. ¶ 174 Some lower courts have formulated a third basis for postconviction relief for defendants claiming that a deliberating juror infected the fairness of the trial. See, e.g., United States v. Powell, 226 F.3d 1181, 1188 (10th Cir. 2000); Gonzales v. Thomas, 
96 99 F.3d 978, 987 (10th Cir. 1996); United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976). This doctrine has sometimes been called common law implied bias. Neither the United States Supreme Court nor the Colorado Supreme Court has ever approved or applied this doctrine. ¶ 175 In fact, I read Colorado Supreme Court precedent as precluding our application of this doctrine. The court has made plain that “[i]mplied biases ‘apart from the statutory scheme’ do not exist, because our task is to apply the plain language of section 16-10-103(1)[] as written.” People v. Bonvicini, 2016 CO 11, ¶ 17. ¶ 176 There is an additional reason we should not adopt the common law implied bias doctrine. In my view, the doctrine — as articulated by the United States Court of Appeals for the Tenth Circuit in Gonzales and Powell — is impossible to apply in a principled manner. That court, and the few others that have  Although the Supreme Court has never recognized the doctrine of common law implied bias, Justice O’Conner observed in a concurrence that “[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.” Smith v. Phillips, 455 U.S. 209, 221-22 (1982) (O’Connor, J., concurring). 
97 embraced the doctrine, have made it clear that its reach is extremely limited. The Tenth Circuit has held that “[t]he implied bias doctrine should not be invoked lightly. It must be reserved for those ‘extreme’ and ‘exceptional’ circumstances that ‘leav[e] serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.’” Gonzales, 99 F.3d at 987 (quoting Smith v. Phillips, 455 U.S. 209, 222 (1982) (O’Connor, J., concurring)). ¶ 177 But no court applying the doctrine has suggested any principled bases to distinguish cases that require relief from cases that do not. What constitutes “extreme” and “exceptional” circumstances? When is there a “serious question” as to whether the trial court’s actions resulted in a “miscarriage of justice”? Without meaningful answers to these questions, Colorado courts should not adopt this doctrine. ¶ 178 Of course, to the extent that the doctrine of common law implied bias is grounded in the United States Constitution, as opposed to nonconstitutional federal jurisprudence, we must apply it because the Constitution is the supreme law of the land. People v. Crouse, 2017 CO 5, ¶ 13 (citing U.S. Const. art. VI, cl. 2). Even if 
98 we are required to apply that doctrine, I agree with the analysis by the postconviction court and the majority in rejecting Owens’s claims under that doctrine.